UNICARE HOMES, INC., d/b/a Concordia Care Center *v.*
James E. GRIBBLE III

CA 98-28                                            977 S.W.2d 490

Court of Appeals of Arkansas
Division III
Opinion delivered October 28, 1998

[Petition for rehearing denied December 9, 1998.]

*Wright, Lindsey & Jennings LLP*, by: *John G. Lile* and *William Stuart Jackson*, for appellant.

*Harry McDermott*, for appellee.

JOHN F. STROUD, JR., Judge. Appellee, James Gribble III, was an at-will employee serving as a certified nursing assistant for appellant, Unicare Homes, Inc., d/b/a Concordia Care Center. On July 17, 1995, Bonnie Jones, appellant's director of nursing, received information that appellee was taking items from the refrigerator located at the nurse's station. She asked appellee to accompany her to her office, where appellee gave her permission to look in his gym bag. Upon doing so, Ms. Jones discovered several packaged dairy products belonging to appellant. Appellee was suspended pending further investigation and was ultimately

discharged pursuant to a strictly enforced policy against theft. He filed suit against appellant, alleging causes of action for retaliatory discharge and outrage. The retaliatory discharge cause of action was subsequently eliminated, and the case went to trial on the outrage claim only. The jury returned a verdict in favor of appellee, awarding $56,000 in compensatory damages and $750,000 in punitive damages. We reverse and dismiss.

Appellant raises the following six points on appeal:

I. Gribble's exclusive remedy is under the Workers' Compensation Act.

II. Gribble failed to introduce sufficient evidence to reach the jury on his outrage claim.

III. Gribble released all claims against Concordia one month after his termination.

IV. The damages award should be reversed or reduced.

V. The trial court erred by precluding Concordia from cross-examining Gribble about his employment application misrepresentation.

VI. The trial court erred by erroneously instructing the jury.

■ ■ Appellant's first point, which contends that jurisdiction for this case lies with the Workers' Compensation Commission rather than circuit court, is without merit. The intentional infliction of an injury upon an employee by an employer is an exception to the exclusive-remedy provision of the Workers' Compensation Act. *Hill v. Patterson*, 313 Ark. 322, 855 S.W.2d 297 (1993). In order to escape the exclusive-remedy provisions of the Act, "the complaint must allege a deliberate act by the employer with a desire to bring about the consequences of the act." *Id.* at 325; *see also VanWagoner v. Beverly Enterprises*, 334 Ark. 12, 970 S.W.2d 810 (1998); *Angle v. Alexander*, 328 Ark. 714, 945 S.W.2d 933 (1997). Appellee's allegations for the claim of outrage, or the intentional infliction of emotional distress, fit within this exception to the exclusive remedy.

Appellant's second point of appeal challenges the sufficiency of the evidence supporting appellee's outrage claim. Under this point, appellant contends that the trial court erred by denying appellant's motions for directed verdict and for judgment notwithstanding the verdict. We agree.

The standard of review for the denial of a motion for a directed verdict or a motion for judgment notwithstanding the verdict is whether the nonmovant's proof was so insubstantial as to require a jury verdict, if entered in his behalf, to be set aside. *St. Edward Mercy Med. Ctr. v. Ellison*, 58 Ark. App. 100, 946 S.W.2d 726 (1997). "Arkansas courts have consistently upheld the general rule that a trial court may enter judgment notwithstanding the verdict only if there is no substantial evidence to support the verdict of the jury and the moving party is entitled to judgment as a matter of law." *Id.* at 105. Substantial evidence is defined as evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty; it must force the mind to pass beyond suspicion or conjecture. *Union Pac. R.R. v. Sharp*, 330 Ark. 174, 952 S.W. 2d 658 (1997). When determining the sufficiency of the evidence, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered. In such situations, the weight and value of testimony is a matter within the exclusive province of the jury. *Id.*

To succeed on a tort-of-outrage claim, the plaintiff must prove that 1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct, 2) the conduct was extreme and outrageous and utterly intolerable in a civilized community, 3) the defendant's conduct was the cause of the plaintiff's distress, and 4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Hollomon v. Keadle*, 326 Ark. 168, 931 S.W.2d 413 (1996). In *City of Green Forest v. Morse*, 316 Ark. 540, 873 S.W.2d 154 (1994), the supreme court examined the history of Arkansas cases involving the tort of outrage arising out of an employee's discharge. The court explained:

We have consistently taken a narrow view in recognizing claims for the tort of outrage that arise out of the discharge of an employee. The reason is that an employer must be given considerable latitude in dealing with employees, and at the same time, an employee will frequently feel considerable insult when discharged. In this context we have written: "Because of the employer's right to discharge an at-will employee, a claim of outrage by an at-will employee cannot be predicated upon the fact of the discharge alone. However, the manner in which the discharge is accomplished or the circumstances under which it occurs may render the employer liable." . . . The duty owed is a matter of law, and we have said that duty is to refrain from conduct that is so extreme and outrageous as to go beyond all possible bounds of decency and to be utterly intolerable in a civilized society. *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980).

Only once have we held that a plaintiff met the standard for proving the tort of outrage in an employee discharge case. That case was *Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984). The facts surrounding that discharge were so extreme and outrageous that they went beyond the bounds of decency and truly were intolerable. The employer, Tandy Corporation, thought that Bone, the manager of one of its stores in Little Rock, was stealing either money or merchandise. Bone suffered from a personality disorder which made him more susceptible to stress and fear than normal. His psychiatrist had prescribed, and he had been taking, a tranquilizer for three years. Bone's supervisor and two security officers came to the store to conduct an investigation of the losses. Bone was questioned at thirty minute intervals throughout the day. According to Bone, the security men cursed him, threatened him, and refused to allow him to take his prescribed medication. Bone was subsequently asked to take a polygraph examination and consented. At that time he was in a highly agitated condition and again asked for his medication. The request was denied. He testified that on at least three occasions he had asked to be allowed to take his medication, but each time his request was refused. He stated that once he reached in a desk drawer for his medicine, but one of the investigators slammed the drawer shut. He was eventually taken to another location in Little Rock for the examination, and, while there, hyperventilated. An ambulance was called, but Bone was taken home by the supervisor. The next day, Bone attempted to return

to work, but was unable to do so. He was subsequently hospitalized for a week. In holding that Bone had met the standard for the tort of outrage surrounding the discharge, we endeavored to make the basis for the holding clear when we wrote:

> It was for the jury to decide whether under the circumstances it was outrageous conduct for the employer to deny Bone his medication and to continue to pursue the investigation knowing Bone was on medication or Valium. *We emphasize that the notice to the employer of Bone's condition is the only basis for the jury question of extreme outrage.*

*Id.* at 542-44, 873 S.W.2d at 156-57.

*Dillard Department Stores, Inc. v. Adams*, 315 Ark. 303, 867 S.W.2d 442 (1993), does not involve an employment situation, but it is similar to the instant case in other respects because the outrage claim arose out of accusations of theft. In the *Dillard* case, a sales manager observed Ms. Adams, a customer, switch the price tags on two bathing suits and then purchase the one with the lower price tag. As Ms. Adams was leaving the store, the manager and a security guard stopped her, identified themselves as "Dillards security," and asked her to accompany them to the rear of the store. In a manager's office, Ms. Adams was confronted about switching the price tags. She denied any wrongdoing. The store manager and the police were called. The store manager questioned Ms. Adams, took her picture, and told her she was banned from the store. The police issued her a citation and escorted her from the store. The entire incident lasted from twenty minutes to an hour. The supreme court stated:

> In subsequent decisions, we have addressed outrage in a cautious manner. Our recognition of this tort is not intended to "open the doors of the courts to every slight insult or indignity one must endure in life." . . .
>
> We cannot say Ms. Adams presented sufficient evidence for a jury instruction on the tort of outrage. Ms. Adams testified the entire incident lasted less than an hour. During that time she was not physically touched, and while Dillards employees may have questioned her in a confrontational manner, there is no evidence that their tone was abusive or harassing. Ms. Adams testified that Ms. Hallmark initially confronted her in a professional manner

and in such a way as not to draw the attention of any other customers.

> We do not mean to say that Dillards' employees' actions were merely a "slight insult." We recognize Ms. Adams may well have suffered mental distress as a result of them. She was accused of a crime of which she was not convicted. We cannot, however, find in the facts alleged or shown the kind of "extreme degree" of outrageous conduct "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." Whatever the merits of the claim of Dillards and Ms. Hallmark as to Ms. Adams's conduct (and we assume no merit in them for purposes of this appeal) nothing that was done constituted conduct fitting our definition of "outrage."

Here, appellee testified that before he returned from his workers' compensation leave, his immediate supervisor, Barbara Leonard, telephoned him to warn him to watch his back because "they" were trying to fire him; that when he returned to work he was given the chore of cleaning out the "icebox" before he left the shift; that he would put the items that were to be thrown away in his gym bag at the shift change, in full view of other personnel; that he had done this for about six weeks prior to July 17, the date he was suspended; that on July 17, Bonnie Jones stopped him in the hall and asked him to come to her office; that she asked to look in his bag; that he unzipped the bag and pulled out the plastic bag containing the dairy products; that "she started getting upset with me and said I can't believe you stole from the facility"; that he denied stealing and told her he had permission from Dixie Schancer, the dietary manager, to take the items; that he was placed on probation for three days, pending an investigation; that on his termination report, he explained that it was part of his duties to clean out the icebox at the nurse's station and to throw away anything left in it, that he took the items home rather than throw them away, and that he saw no harm in doing so; that he did not write on the termination report that he had permission from the dietary manager because he verbally told Bonnie Jones; that he had a great relationship with Byron Hooppaw, the administrator; that he had a good relationship with Jeanne Moore, the unit clerk; that the only reason Jeanne Moore would be "after him" was if she were told to do so; that he believes she was told to

lie in the letter where she stated that she had ordered milk for the evening snacks and that she had counted milk cartons as she put them in the door, and there were nineteen; that he believed Bonnie Jones and Byron Hooppaw would set him up if they were told to do so; that his beliefs in this regard were not speculation because his immediate supervisor, Barbara Leonard, had told him to watch his back, although she had not identified anyone; that Bonnie Jones "yelled" at him, but she did not curse him and she did not assault him; that he was denied unemployment benefits; that everything Concordia did was because he filed a workers' compensation claim; that he looked for jobs at maybe fifty places until December 1995; that he heard Bonnie Jones tell a prospective employer that he was not eligible for rehire; and that he was depressed, had stomach pains, and would have killed himself but for his religion.

Dixie Schancer, appellant's dietary manager, testified on behalf of appellee. She explained that she gave appellee permission to take home milk cartons that were sitting on the dining-room tables; that no one came to her to talk about the matter; that when she learned appellee had gotten in trouble, she was upset because she had told him he could take the milk from the dining room; that appellee didn't ask for permission to take milk cartons from the nurse's floor, but that if he had asked she would have told him to check with the director of nursing, Bonnie Jones; and that if Jeanne Moore had ordered the milk for evening snacks on July 17, it was unlikely she would have received them in the morning.

Byron Hooppaw, administrator, testified that he was not aware at the time of the allegation that Dixie Schancer had given appellee permission to take milk from the dining room; that it would be reasonable to assume that a certified nursing assistant would feel that he had permission to take home refused snack milk by asking Schancer's permission; that when he found out about the permission Dixie had given appellee, it did not affect his decision because appellee's duffel bag was full of milk products taken from the nurse's station refrigerator that belonged to the facility and they were in his bag when they should not have been; that

Jones had come to him for advice on how to handle the situation, and that he had told her it seemed "cut and dry" and did not seem like there was much more investigation that could be done; that the decision to terminate appellee was a combination decision between Jones and himself; that he was under no pressure to make the decision; and that Jerry Alexander, Hooppaw's boss, did not know about the situation at the time.

Jeanne Moore, the unit clerk, testified that Jo Bundy, a housekeeper, had told her a couple of days prior to the incident that one of the aides was removing products out of the refrigerator; that she did not remember ordering the milk cartons on July 17, and that she never would have ordered nineteen; that she counted the number of milk cartons in the refrigerator that day and there were nineteen, some of which were to be thrown away; that Bundy told her again on the day of the suspension that appellee was removing the milk; that she went to the nurse's station and appellee was standing there closing his bag; that she went to Jones's office and told Jones what had been reported to her; that as she and Jones walked to the nurse's station, appellee was coming toward them; that Jones said, "Jimmy, I'd like to talk to you"; that Moore then returned to the nurse's station and opened the refrigerator and the milk was missing; that in writing her statement, she was just reporting her actions and she was not trying to get appellee fired.

Bonnie Jones, director of nursing, testified that Jo Bundy, the housekeeper, came to her office and told her that she'd seen appellee taking toilet paper and milk; that Bundy reported this approximately one week prior to July 17; that Jeanne Moore also mentioned to her that she suspected milk was being taken from the refrigerator; that on July 17, she found in appellee's bag milk products, Ensures, shakes, and yogurt; that after her meeting with appellee on the 17th, she asked Moore to write a statement about what happened; that she talked to Bundy, but Bundy was afraid to put anything in writing for fear other certified nursing assistants would be mad at her and Jones did not force the issue; that Jones then talked to Byron Hooppaw; that no one pressured her to fire

appellee; that at some later point, she talked to Dixie and Dixie told her that she had allowed appellee to take the leftover milk from breakfast in the dining room; that this information did not change Jones's opinion as to what happened because appellee took not only the returned milk cartons, but also what Jeanne Moore had ordered that morning for the patients. In a letter to the Arkansas Employment Security Department dated August 9, 1995, Ms. Jones stated that in addition to stealing from the facility, appellee had committed a serious infection-control violation by putting milk products back into the refrigerator.

█ Appellee urges us to adopt his theory that the entire episode was concocted by appellant in order to frame appellee and thereby get rid of him. Considering all such evidence in the light most favorable to appellee, we do not find that appellant's conduct fits the definition of outrage. We conclude, therefore, that there was not substantial evidence to support appellee's claim for outrage, and that the trial court erred in denying appellant's motions for directed verdict and for judgment notwithstanding the verdict. Finding, as we do, that the trial court erred in denying appellant's motions for directed verdict and judgment notwithstanding the verdict, it is not necessary to address points three through six of the points of appeal.

Reversed and dismissed.

ROBBINS, C.J., and MEADS, J., agree.