Mike CUMMING, Mizan Rahman, and M&M Properties *v.*
PUTNAM REALTY, INC.

CA 02-293 92 S.W.3d 698

Court of Appeals of Arkansas
Divisions III and IV
Opinion delivered December 18, 2002

*Eichenbaum, Liles & Heister, P.A.,* by: *Christopher O. Parker* and *Mitchell L. Berry,* for appellants.

*Wright, Lindsey & Jennings LLP,* by: *Justin T. Allen,* for appellee.

JOHN F. STROUD, JR., Chief Judge. This case arises from the trial court's grant of summary judgment to appellee, Putnam Realty, Inc., awarding it $28,317.50, plus prejudgment and postjudgment interest. It involves the construction of two contracts, a commission agreement between the parties and a lease agreement between appellants and Crown Communications. The dispute centers on the appropriate commission fee that appellants are obligated to pay appellee for negotiating the leasing arrangement between Crown Communications and appellants with respect to property owned by appellants. The property lease was for a 100-foot by 100-foot parcel of land to be used as a cellular-tower site. Appellants Mike Cumming and Mizan Rahman comprise the general partnership called M&M Properties, which is also an appellant in this case. James C. Hill, a licensed real estate agent for appellee, negotiated the deal between appellants and Crown Communications. Appellee and appellants both filed motions for summary judgment below. Appellee prevailed.

Appellants raise two points of appeal: 1) "the trial court erred as a matter of law in its construction of the commission agreement," 2) "the court-awarded fee should be reversed if the substantive award is reversed and improperly includes fees generated before the litigation." Finding no error, we affirm the trial court's grant of summary judgment and award of fees.

Appellee's motion for summary judgment basically contended that appellants owed it a commission fee of $28,317.50. The asserted fee represented ten percent of the gross rentals during the initial term of the lease, which appellee contended was a period of twenty-five years. Appellee's motion for summary judgment was supported by three documents: 1) Jim Hill's affidavit, 2) the commission agreement between the parties, and 3) the lease agreement between Crown and appellants. Hill stated in his affidavit that he contacted appellants to determine if they were interested in leasing some of their property for a cellular tower. He stated that at the time he contacted them, he was aware that Crown Communications might be interested in such a lease and that he so informed appellants. He stated that appellants were interested and that they entered into a commission agreement with Putnam, providing that Putnam would act in their behalf to acquire Crown as a lessee. In exchange, appellants agreed to pay a commission for those services. The commission agreement was prepared by appellee and provides in pertinent part:

> WHEREAS, Broker has presented to Lessor a proposed Lease Agreement pursuant to which the Lessor would lease to *Crown Communications*, as Lessee a site on the Property for the location of a freestanding cellular tower and related communications facility as more particularly set forth in the Lease Agreement attached hereto and made a part hereof as Exhibit "A" (the "Lease");
>
> WHEREAS, Lessor has agreed to pay Broker a commission in consideration of Broker's efforts to obtain the Lease for the benefit of Lessor upon the terms and conditions set forth hereinafter;
>
> NOW, THEREFORE, the parties hereto intending to be bound by these presents do hereby agree as follows:
>
> Section 1. In consideration of the Broker's efforts to obtain the Lease and the benefits to inure thereunder to the Lessor, the

Lessor hereby agrees to pay a commission to Broker equal to ten percent (10%) of the "Gross Rentals" due to Lessor pursuant to the terms of the Lease (the "Commission"). "Gross Rentals" for purposes hereof means the total of all rental payments and other consideration due to Lessor during the initial term of the Lease. The Commission shall be payable in full in cash or its equivalent on or before the date of execution of the Lease by the parties thereto, or at such date as shall be mutually agreeable to the parties hereto.

. . . .

Section 4. This Agreement shall constitute the entire agreement between the Lessor and the Broker with respect to the Commission and shall supersede any and all other prior agreements, whether written or oral, concerning the matters set forth hereinabove.

Jim Hill's affidavit stated in paragraph six that at the time the commission agreement was executed, he was in possession of a copy of Crown's standard lease agreement; that it was made available to appellants; and that it was attached as an exhibit to the agreement. He stated that he subsequently presented Crown with the option of leasing appellants' property and that they expressed the desire to do so. Hill stated that according to Crown's standard lease agreement, Crown is able to cancel a lease at any time by giving six months' notice. He testified that he attempted to negotiate a ten-year non-cancellation agreement with Crown, but was only able to secure a five-year non-cancellation agreement. He further testified that the twenty-five-year "Initial Term" contained in Crown's standard lease agreement was maintained in the final lease agreement between Crown and appellants. Finally, he explained that although the "Initial Term" of the lease between appellants and Crown had begun, appellants had failed to pay the commission that was due pursuant to the terms of the agreement.

The lease agreement that was executed between appellants and Crown contains the following pertinent provisions:

2. **Lease Term**. This Lease shall be for an initial term of twenty-five years, beginning on the date of Lessee's commencement of construction of the proposed wireless communications facility (the "Initial Term"). This Lease shall automatically be

extended for three subsequent twenty-five year terms (the "Renewal Terms") unless Lessee terminates it pursuant to the provisions set forth herein. The Initial Term and any Renewal Terms shall be collectively referred to as the "Lease Term." Lessee shall pay to Lessor $700.00 upon the complete execution of this Lease. Lessee shall have six (6) months from the execution of this Lease to commence construction or obtain necessary zoning approvals and/or building permits. For an additional payment from Lessee to Lessor in the amount of $700.00, Lessor agrees to grant one (1) additional six (6) month period within which to commence construction or obtain necessary zoning approvals and/or building permits. Lessor will reasonably consider additional periods beyond the second six (6) month period in the event Lessee needs additional time to procure the necessary zoning approvals and/or building permits.

3. **Rent**. Upon commencement of the Initial Term, Lessee shall pay to Lessor $8,400.00 per year to be paid in equal monthly installments of $700.00 as rent for the Leased Premises (the "Rent"). After the first five years of the Initial Term, the Rent shall increase by fifteen percent over the Rent that was in effect during the previous five-year period. For every five-year period thereafter, the Rent shall be increased by fifteen percent over the previous five-year period.

4. **Lessee's Right to Terminate**. Except for Lessee's right to terminate this Lease arising from Lessor's breach of this Lease, once Lessee receives all Approvals and the wireless communications facility becomes operational, Lessee shall have no right to terminate this Lease during the first five (5) years of the Initial Term. Thereafter, Lessee shall have the unilateral right to terminate this Lease, at any time, by providing Lessor with six months prior written notice. Said termination shall be effective upon Lessee providing notice of termination to Lessor.

5. **Effect of Termination by Lessee**. Upon termination of this Lease by Lessee, this Lease shall become null and void and all of the parties shall have no further obligations except that any monies owed up to the date of termination shall be paid within thirty days of the termination date.

Appellants responded to appellee's motion for summary judgment and, in addition, sought summary judgment of their own. Their basic contention was that the proper construction to be given the agreements was that they only owed a commission

fee of $4,200, which was based upon ten percent of the gross rentals that were due during the five-year non-cancellable portion of the lease, rather than the twenty-five-year initial term asserted by appellee. In a supporting affidavit, appellant Rahman countered Hill's averments 1) that Hill had made him aware of the standard Crown lease at the time the commission agreement was executed and 2) that it was made an exhibit to that agreement. In addition, Rahman stated that he had proffered a check for $4,200 to appellee, which represented ten percent of the gross rentals that were currently due to appellants under the terms of the lease agreement. He stated that appellee returned the check uncashed and insisted that appellants owed $28,317. Rahman stated that he recognized that if Crown did not terminate its lease after five years that appellants would need to make additional payments at that time to appellee.

 In *Parkerson v. Lincoln*, 347 Ark. 29, 31, 61 S.W.3d 146, 148 (2001), our supreme court set forth the appropriate standard of review for summary-judgment cases:

> We have ceased referring to summary judgment as a "drastic" remedy. We now regard it simply as one of the tools in a trial court's efficiency arsenal; however, we only approve the granting of the motion when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to a day in court, *i.e.*, when there is not any genuine remaining issue of material fact and the moving party is entitled to judgment as a matter of law. The burden of proving that there is no genuine issue of material fact is upon the movant, and all proof submitted must be viewed favorably to the party resisting the motion. On appellate review, we determine if summary judgment was proper based on whether the evidence presented by the movant left a material question of fact unanswered.

(Citations omitted.)

Here, the only possibly disputed facts involve Rahman's denial of Hill's averments 1) that Hill had made him aware of the standard Crown lease at the time the commission agreement was executed and 2) that it was made an exhibit to that agreement.

However, all of the facts that are material to deciding this case are undisputed and it becomes a matter of contract interpretation.

█ As we explained in *Holytrent Properties v. Valley Park Limited*, 71 Ark. App. 336, 339-40, 32 S.W.3d 27, 29-30 (2000) (citations omitted):

> The construction and legal effect of a written lease contract are to be determined by the court as a question of law, except where the meaning of the language depends on disputed extrinsic evidence. When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed. . . . Parties are free to make contracts based on whatever terms and conditions they agree upon, provided the contract is not illegal or tainted with some infirmity such as fraud, overreaching, or the like.

Here, appellants' argument can be fairly summarized as follows:

1) That this court should pay particular attention to the term "due," which is contained in the commission agreement, and harmonize it with the term emphasized by appellee, "initial term." Appellants cite cases that provide that in construing conflicting clauses in a contract, this court must not give effect to one clause to the exclusion of another, nor adopt an interpretation that neutralizes a provision, if the various clauses can be reconciled, *i.e.*, that the contract must be construed to give effect to every word. *See, e.g., Sturgis v. Skokos*, 335 Ark. 41, 977 S.W.2d 217 (1998);

2) That in *Black's Law Dictionary* (4th ed.), the editor comments that "the word 'due' always imports a fixed and settled obligation or liability, but with reference to the time for its payment there is considerable ambiguity in the use of the term, the precise signification being determined in each case from the context";

3) That the words "initial term" are not capitalized nor given any special emphasis in the commission agreement and "[t]here is nothing strained or stretched in interpreting that phrase in the commission agreement to being simply the period of time the tenant is committed to the terms of the lease," *i.e.*, five, not twenty-five years;

4) That the use of the two terms create an ambiguity for which no extrinsic evidence was submitted, and because the contract was prepared by appellee, any doubts as to the meanings of its provisions should be resolved against appellee.

Appellee, on the other hand, contends that the language is clear and unambiguous and that it supports appellee's position. Appellee emphasizes that the commission agreement's language specifically references the lease, providing that "the Lessor hereby agrees to pay a commission to Broker equal to ten percent (10%) of the 'Gross Rentals' due to Lessor *pursuant to the terms of the Lease (the 'Commission')*"; that "gross rentals" is defined in the commission agreement as "the total of all rental payments and other consideration due to Lessor *during the initial term of the Lease*"; and that the lease agreement then provides that "[t]his Lease shall be for an initial term of twenty-five years. . . ."

■ We find that the parties expressed their intention in written instruments using clear and unambiguous language. Appellants did not have to sign the lease agreement without first referring back to the commission agreement and acquiring any legal help that they might have needed in understanding what it was that they were signing. They could have negotiated another deal, but they did not. Moreover, as further substantiation that the initial term of the lease was not five years as urged by appellants, we note that paragraph four of the lease agreement provides "Lessee shall have no right to terminate this Lease *during the first five (5) years of the Initial Term.*" (Emphasis added.) We agree with the trial court's construction of the agreements as a matter of law.

■ With respect to appellants' second point of appeal, we simply do not find convincing appellants' argument that the precomplaint legal fees should not have been included in the fee award. Appellants cite no specific legal authority for their position, and neither do they convince us that the court abused its discretion by including the pre-complaint legal fees in the award.

Affirmed.

HART, ROBBINS, VAUGHT, and BAKER, JJ., agree.

ROAF, J., dissents.

ANDREE LAYTON ROAF, Judge, dissenting. I would reverse the trial court's grant of summary judgment to appellee. The Commission Agreement provided that the appellee's commission was to be 10% of the Gross Rentals, due to appellants *pursuant to the terms of the lease*. "Gross Rentals" was defined as the "total of all rental payments . . . *due* to appellants during the initial term of the lease."

The lease executed between appellants and Crown Communications provided for an initial term of twenty-five years at an annual rental of $8400, with Crown having the right to extend for three subsequent twenty-five-year terms. However, Crown had the unilateral right to terminate after the first five years of the initial term by providing six months' prior written notice. The lease then would become "null and void" and the parties "shall have no further obligations." This provision is as much a part of the terms of the lease as is the provision calling for an "initial term."

I agree with appellants' argument that there is sufficient ambiguity in the phrase "due to Lessor" as used in the Commission Agreement such that summary judgment should not have been granted. Moreover, "due to Lessor pursuant to the terms of the Lease" necessarily includes *all* of the terms, including the lessee's absolute right to terminate after five years. The lease would then become null and void, again pursuant to its terms, and further lease payments would certainly not be due.

Appellants have conceded that they would owe additional commissions if Crown Communications elects to continue with the lease after the first five years; this conflicts with the Commission Agreement clause calling for payment of the commission in advance. However, the agreement was prepared by the appellee, and to the extent the two provisions cannot be reconciled, should be construed against the drafter.