Gene ADDINGTON *v.* WAL-MART STORES, INC.

CA 02-626 105 S.W.3d 369

Court of Appeals of Arkansas
Division II
Opinion delivered April 23, 2003

442

*Odom & Elliott,* by: *Bobby Lee Odom* and *Conrad T. Odom*; and *Ray Bunch* for appellant.

*Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A.,* by: *David R. Matthews* and *George R. Rhoads,* for appellee.

JOSEPHINE LINKER HART, Judge. In this case from Benton County, the trial court granted summary judgment to Wal-Mart on five causes of action brought against it by appellant Gene Addington, a former employee: 1) the tort of outrage; 2) false-light invasion of privacy; 3) intrusion invasion of privacy; 4) defamation; and 5) negligence. Addington argues that summary judgment was inappropriate because genuine issues of material fact remain on each count. We affirm the grant of summary judgment on the outrage, false-light invasion of privacy, defamation, and

negligence claims. However, we reverse and remand on the intrusion invasion-of-privacy claim.

Gene Addington is the former maintenance supervisor of Wal-Mart's home office maintenance facility in Bentonville. In August of 1998, he was terminated when it was discovered that he was in possession of property that belonged to Wal-Mart. He later filed suit against Wal-Mart, alleging that, in conducting the investigation that led to his termination, Wal-Mart committed the above mentioned tortious conduct. To place his allegations in context, it is necessary to recite a history of the investigation and surrounding events.

On August 13, 1998, two Wal-Mart loss prevention officers, Jim Elder and Keith Womack, began surveillance of Bob Kitterman, an employee of Wal-Mart's home office maintenance department. The surveillance led to the discovery that Kitterman and his son-in-law were in possession of tools and other property allegedly stolen from Wal-Mart. On August 17, another maintenance facility employee, David Clark, was interviewed with regard to stolen property. A subsequent search of Clark's home resulted in the seizure of approximately 400 items that Wal-Mart contended were stolen from its facility. Thereafter, on August 20, 1998, Elder and Womack, along with personnel officer Melinda Hass, interviewed the other employees of the maintenance department. During the interviews, employee Hays Buenning admitted to being in possession of Wal-Mart property that he did not own. A search of Buenning's home by Elder and Womack revealed several items allegedly belonging to Wal-Mart. Buenning was suspended, and he spoke with Addington on the phone that night, telling Addington that his (Buenning's) house had been "ransacked."

The next day, August 21, 1998, Womack conducted an interview with Addington. He asked Addington if he had any property that belonged to Wal-Mart. Addington admitted that he had some light poles in his yard that had been given to him by his supervisor Bob Murphy and a VCR and monitor that he had gotten from David Clark, though he was not sure if they belonged to Wal-Mart. According to Addington, Womack asked if they might go to Addington's home to view the light poles. Addington

agreed, and Elder and Womack followed him in a separate car. While they were en route, Elder called for a Benton County deputy to meet the men at Addington's house, telling the dispatcher that stolen property from Wal-Mart was located there.

When the deputy arrived, Elder asked Addington to sign a consent form to allow a search of his home. Addington refused until he could speak with his wife, who was inside the home. After speaking with Mrs. Addington, who became very upset, Addington again communicated his refusal to sign the consent form, and he went back inside the house. The men stayed on the premises, however, and Addington observed Elder walking toward his shop building. Addington returned to the front porch and reiterated that he would not sign the consent. According to Addington, Womack said, "Well, we'll just call the IRS and let them do the math." During this same time frame, Elder said to Addington, "Gene, I can get a search warrant. I've already talked to someone." Also, according to Mrs. Addington, Womack stated at some point that "we don't need the media involved in this" or "we don't need to get the media up here." Addington went back inside, called attorney Paul Davidson, and told him that he was afraid that, if he did not consent to the search, his job would be in jeopardy. Davidson told him that, while he did not have to consent to the search, Wal-Mart could probably obtain a warrant and that, if he was convinced that refusal to consent would result in his termination, he should allow the search. At that point, Addington went back outside and signed the consent form. The time span between the parties' arrival at the Addington property and the signing of the consent form was approximately thirty minutes. During this time, the deputy never spoke with Addington; he sat in his car in the driveway.

After Addington signed the consent form, Elder conducted a search of Addington's shop with the deputy alongside him. Elder questioned Addington about where he had obtained various items. Addington explained where he had purchased the items and, once a satisfactory explanation was given, Elder mentioned it no further. However, Addington admitted that, in addition to the light poles, monitor, and VCR, he had some toilets and water heaters that he had removed from a Wal-Mart facility. Addition-

ally, he had a security camera, which he had purchased from a Wal-Mart vendor for $5.00, in violation of company policy. Elder confiscated the monitor and VCR and asked Addington to disconnect the camera and bring it with him to the office on Monday. Addington was suspended on the spot and later terminated. In all, five employees were fired as the result of this investigation. Wal-Mart's handling of the investigation has led to several lawsuits being filed by the men accused.

After Addington filed the instant action in Benton County Circuit Court, seeking redress for outrage, false-light invasion of privacy, intrusion invasion of privacy, defamation, and negligence, discovery was undertaken. Thereafter, Wal-Mart filed a motion for summary judgment on each count in the complaint. The trial court granted the motion, and this appeal followed.

 Our standard of review of summary-judgment cases is well established. We have ceased referring to summary judgment as a drastic remedy. *Cumming v. Putman Realty, Inc.*, 80 Ark. App. 153, 92 S.W.3d 698 (2002). We now regard it simply as one of the tools in a trial court's efficiency arsenal; however, we approve the granting of the motion only when the state of the evidence as portrayed by the pleadings, affidavits, discovery responses, and admissions on file is such that the nonmoving party is not entitled to a day in court, *i.e.*, when there is no genuine remaining issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* The burden of proving that there is no genuine issue of material fact is upon the movant, and all proof submitted must be viewed favorably to the party resisting the motion. *Id.* Where the evidence, although in no material dispute as to actuality, reveals aspects from which inconsistent hypotheses might reasonably be drawn and reasonable minds might differ, summary judgment is not proper. *Lee v. Hot Springs Village Golf Sch.*, 58 Ark. App. 293, 951 S.W.2d 315 (1997).

Our supreme court recently affirmed a jury verdict of $651,000 in compensatory damages and $1,000,000 in punitive damages on behalf of David Clark for invasion of privacy and defamation. *See Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002). Although the circumstances in that case differ

in many respects from the circumstances in this case, there are sufficient similarities to warrant our reliance on it in some respects, as will be explained later in this opinion.

We begin by addressing Addington's argument that the trial court erred in granting summary judgment on his outrage claim. Addington argues that a fact question remains on his outrage cause of action because: 1) Jim Elder told him that he had been "under surveillance with people watching him from up in the trees"; 2) he was told that his co-worker Buenning was "a thief and a liar"; 3) Wal-Mart used the police to coerce him into signing the consent form; 4) Womack threatened him with the IRS; 5) Elder "made comments about stolen property" on Addington's land; 6) Wal-Mart failed to investigate whether Addington had been given permission to take the light poles home; 7) Elder and Womack refused to leave when Addington declined to consent to the search; and 8) there were "threats of search warrants."

The supreme court has formulated four factors necessary to establish the tort of outrage: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Faulkner v. Arkansas Children's Hosp.*, 347 Ark. 941, 69 S.W.3d 393 (2002). Despite judicial recognition of this tort, the courts have addressed it in a cautious manner and have stated that recognition of it is not intended to open the doors of the courts to every slight insult or indignity one must endure in life. *See, e.g., Dillard Dep't Stores, Inc. v. Adams*, 315 Ark. 303, 867 S.W.2d 442 (1993). In particular, the courts have taken a narrow view of claims that arise out of the discharge of an employee. The reason is that an employer must be given considerable latitude in dealing with employees, and at the same time, an employee will frequently feel considerable insult when discharged. *City of Green Forest v. Morse*, 316 Ark. 540, 873 S.W.2d 154 (1994).

■ ■ The type of conduct that meets the standard for outrage must be determined on a case-by-case basis. *Crockett v. Essex Home, Inc.*, 341 Ark. 558, 19 S.W.3d 585 (2000). .We require clear-cut proof to establish the elements in outrage cases. *Id.* Merely describing the conduct as outrageous does not make it so. *Id.* Clear-cut proof, however, does not mean proof greater than a preponderance of the evidence. *Id.*

The trial court ruled that the facts presented by Addington were not so outrageous or extreme as to go beyond all possible bounds of decency and further, that Addington's symptoms did not constitute emotional distress so severe that no reasonable person should be expected to endure it. We agree with the trial court.

■ On the first of the eight factors alleged by Addington to support his claim, Addington has misrepresented his own deposition testimony. He testified that, when Elder, Womack, and Hass met with the maintenance employees on August 20, Elder "went through some of these techniques as how they do it and what they do, and a reference was made to people sitting in trees observing other people to watch them and all that." Addington acknowledged that Elder did not say anyone was sitting in trees watching Addington. Further, Addington said that nothing at the August 20 meeting made him mad or was considered by him to be inappropriate. On the second factor, Addington attempts to base his outrage claim on the fact that Wal-Mart labeled a co-worker a liar and a thief. Addington cites no authority, and we have found none for the proposition that insulting a third person may give rise to outrage. On factor number three, Wal-Mart's use of the police for intimidation purposes is not well borne out here. Although a deputy was present when the consent to search was being offered to Addington, the deputy sat in Addington's driveway while the controversy over the consent was going on. Addington stated that the only conversation he had with the deputy was when he eventually signed the consent form "to get rid of them." Addington also stated that the deputy "never stepped foot on my grass or on my sidewalk." Further, when the search took place, the deputy did not go into Addington's home, although he did go into his shop.

On the fourth factor — the mention of the IRS — there is no question that a threat to notify the Internal Revenue Service is an intimidating technique, but we do not think it constitutes outrage. The reference to the IRS was vague in nature, and there was no evidence that Addington was particularly susceptible to a mention of the IRS. The "comments about stolen property" that Addington mentions in factor number five references Elder's description of the security camera as stolen and Elder's question to Addington, during the search of the shop, "where is the pallet of tools?" Accusations of theft, however, do not constitute outrage. *See Dillard Dep't Stores v. Adams, supra; Unicare Homes Inc. v. Gribble*, 63 Ark. App. 241, 977 S.W.2d 490 (1998). As for Wal-Mart's failure to investigate whether Addington had permission to take the light poles home, as alleged in factor number six, Wal-Mart did conduct an investigation, although it may have been incomplete. Wal-Mart asked Addington's supervisor if he had given Addington permission to take the poles, and the supervisor said "absolutely not." It later developed that an employee said that she had overheard the supervisor giving Addington permission to take the poles. While this might constitute a lack of thoroughness by Wal-Mart, it is not the type of conduct that goes beyond all bounds of decency.

Regarding Elder and Womack's failure to leave when Addington declined to sign the consent form, undeniably they were putting pressure on him by their continued presence. However, they never tried to enter his home or use physical violence. Finally, on factor number eight, we fail to see how the threat of obtaining a search warrant is outrageous conduct when Addington had already acknowledged that he had property belonging to Wal-Mart in his home and his attorney had likewise told him that Wal-Mart could probably get a warrant.

Whether each of the above factors is taken individually or they are considered as a whole, we do not believe Wal-Mart's conduct rose to the level of that required for outrage. Although Wal-Mart's conduct was aggressive and intimidating, it did not go beyond all bounds of decency, especially when we consider some of the conduct that employers in other cases have committed and not been held liable. *See, e.g., Faulkner v. Arkansas Children's Hosp., supra* (strained working relationships, a deliberate attempt to under-

mine the employee's authority, and false accusations of shoddy work and mental illness); *Stockton v. Sentry Ins.*, 337 Ark. 507, 989 S.W.2d 914 (1999), (cutting off dental benefits in mid-procedure and telling employee's wife that employee was a "lazy s.o.b." who wasn't good enough for her); *City of Green Forest v. Morse, supra* (cursing and speaking angrily and inquiring into employee's personal life); *Webb v. HCA Health Servs.*, 300 Ark. 613, 780 S.W.2d 571 (1989) (being verbally abusive, making derogatory remarks about employee to others, asking employee to falsify records, and misrepresenting cause for termination); *Sterling v. Upjohn Healthcare Servs.*, 299 Ark. 278, 772 S.W.2d 329 (1989) (undermining employee's authority, making false accusations of drunkenness and of falsifying job application, cursing employee, and asking others to report on employee). In light of our holding that Wal-Mart's conduct did not transcend the bounds of decency, we need not address whether Addington sustained emotional distress so severe that no reasonable person could be expected to endure it.

Addington argues next that his invasion of false-light invasion-of-privacy claim should not have been dismissed by way of summary judgment. The right to recover for a false-light invasion-of-privacy claim is conditioned upon the complaining party's demonstrating that (1) the false light in which he was placed by the publicity would be highly offensive to a reasonable person, and (2) that the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed. *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979), *cert. denied*, 444 U.S. 1076 (1980). The evidence must support the conclusion that the publisher had serious doubts about the truth of his publication. Howard W. Brill, *Arkansas Law of Damages* § 33-11 at 671 (4th ed. 2002). In false-light actions, the plaintiff's burden of proof is governed by the clear-and-convincing-evidence standard. *Dodrill, supra.*

Where the plaintiff is not a public figure and the publication is of matters of general or public concern, the plaintiff must prove actual malice by clear and convincing evidence. *Dodson v. Dicker*, 306 Ark. 108, 812 S.W.2d 97 (1991). Statements made with actual malice are those made with knowledge that the statements

were false or with reckless disregard of whether they were false or not. *Id.*

Addington's claim on this count is based on certain written and oral statements made by Jim Elder during the course of the investigation. During the drive from Wal-Mart to Addington's home on August 21, Elder telephoned the police while en route and asked for help in retrieving "stolen property." In Elder's initial investigation synopsis, he stated that Addington "voluntarily admitted having possession of Wal-Mart merchandise at his house for which he had not reimbursed the company." He also stated:

> Addington admitted having light fixtures and poles on his property belonging to Wal-Mart. In addition, he stated that he still had a monitor and computer given to him by David Clark which he had not been paid for. He also admitted to being in possession of a VCR brought over by Clark. Addington stated that he had some toilets and (2) water heaters that he had removed from one of the Wal-Mart facilities during a remodel.

Elder furnished a copy of this report to the county prosecutor and to several persons within the company, all of whom it appears were either part of the loss prevention or the corporate fraud department. Finally, in a letter to personnel officer Melinda Hass, Elder stated that, during the August 21 interview, Addington admitted to having some items in his residence that were not paid for, and that, while at the residence, Addington gave Elder a recorder and monitor that belonged to Wal-Mart and had not been paid for, and a camera that he had purchased from a Wal-Mart vendor for five dollars.

Addington argues that these statements placed him in a false light by insinuating that he was part of a theft ring and that he possessed stolen property. We disagree. First of all, the statements are not false, even when viewed in a light most favorable to Addington. Addington admitted to having, on his property, toilets and water heaters that he had taken from Wal-Mart. He also said that the VCR "very well could have been Wal-Mart's." Finally, he admitted in his deposition that the statements in Elder's case synopsis regarding the property he had was accurate. We also conclude that, even if Elder's statements were subject to a more favorable interpretation to Addington, the statements were protected by a

qualified privilege. A communication is qualifiedly privileged when it is made in good faith upon any subject matter in which the communicator has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty. *Wal-Mart Stores, Inc. v. Lee, supra.* The privilege is lost if abused by excessive publication, where a statement is made with malice, or where a statement is made with a lack of grounds for belief in its truthfulness. *Id.* Whether a particular statement falls within the scope of a qualified privilege is a question of fact for the jury. *Id.*

*Wal-Mart v. Lee* is the case that involved Addington's fellow employee David Clark. There, the supreme court held that similar communications by Elder fell outside the privilege because he had grounds to believe that Clark did not possess stolen goods.[1] Such was not the case here. Addington's supervisor had stated that he absolutely had not given Addington permission to take the light poles. Further, Addington admitted during the search to having the toilets and the water heaters, and he made the other statements attributed to him in the previous paragraph. Thus, unlike in *Lee*, the undisputed evidence in this case shows that Elder had every reason to believe that Addington possessed property that rightfully belonged to Wal-Mart. Additionally, Elder's communications were made only to law enforcement officers and appropriate personnel within his own company. Addington simply has not shown that the qualified privilege was lost through excessive publication or malice. We therefore uphold the trial court's grant of summary judgment on the false-light claim.

We likewise hold that the same qualified privilege applies to a portion of Addington's defamation claim. The claim is partially based on the same statements made by Elder to law enforcement officers and Wal-Mart employees as set out earlier; it is also based on Wal-Mart's statement in a letter to the Employment Security Division that Addington removed several items of company property without authorization. On this point, we note that it is an

---

[1] There was evidence that Clark operated his own electronics repair business and had been asked by a supervisor to repair items for the Associates Store, which sold damaged merchandise to employees at a discount. There was also evidence that Clark had been told he could keep some items that were beyond repair. Clark informed Elder of this on the day of the seizure.

employer's duty to make an accurate report to the Employment Security Department and, if made in good faith, the communication is privileged. *See Dillard Dep't Store v. Felton,* 276 Ark. 304, 634 S.W.2d 135 (1982). Given our discussion of qualified privilege on the previous issue, we conclude that the same reasoning applies to these aspects of Addington's defamation claim.

██ ██ The remaining parts of Addington's defamation claim concern Elder's comment that the security camera at Addington's home was "stolen" and his question to Addington during the search of the shed, "where is the pallet of tools?" A viable action for defamation turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation. *Faulkner v. Arkansas Children's Hosp., supra.* The following elements must be proved to support a claim of defamation, whether it be by the spoken word (slander) or the written word (libel): (1) the defamatory nature of the statement of fact; (2) that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages. *Id.*

██ ██ As for the stolen camera, there is no showing by Addington that anyone heard or could have heard this comment. In light of that, there is no evidence of publication or damage to reputation. Further, Addington can hardly say that he was damaged by such a comment when, in fact, he possessed items that were taken from Wal-Mart without authorization. As for the inquiry about the pallet, we fail to see how this question is defamatory. An actionable statement is one that tends or is reasonably calculated to cause harm to another's reputation. *Dodson v. Allstate Ins. Co.,* 345 Ark. 430, 47 S.W.3d 866 (2001). Also, a defamatory statement must imply an assertion of an objective, verifiable fact; it should, for example, be capable of being proved true or false. *See Faulkner v. Arkansas Children's Hosp., supra.* The question does not meet these criteria. Additionally, Addington could point to no damage to reputation other than his assertion that it had been harmed among the contractors with whom he did business, none of whom were present when this inquiry was made. We therefore affirm the trial court's grant of summary judgment on the defamation count.

■ ■ We turn now to Addington's cause of action for intrusion invasion of privacy. Intrusion is the invasion by a defendant upon the plaintiff's solitude or seclusion. *Wal-Mart Stores, Inc. v. Lee, supra.* Arkansas courts have seldom adjudicated intrusion claims. *Id.* The tort consists of three parts: (1) an intrusion; (2) that is highly offensive; (3) into some matter in which a person has a legitimate expectation of privacy. *Id.* A legitimate expectation of privacy is the touchstone of the tort of intrusion. *Id.*

Wal-Mart argues here, as it did in *Lee, supra,* that there was not an intrusion because there was a consent to the search. Addington argues that a fact question remains as to whether his consent was freely and voluntarily given. We agree.

■ Though the validity of consent in a civil case does not involve a defendant's motion to suppress evidence seized in a criminal case, the standard for determining valid consent in the criminal context is helpful. *Lee, supra.* Consent must be given freely and voluntarily to be valid. *Id.* It must be shown that there was no duress or coercion, actual or implied. *Id.* The voluntariness of consent must be judged in light of the totality of the circumstances. *Id.* In a civil case, the issue of whether consent was valid is a question of fact that must be decided by the trier of fact. *Id.*

■ In *Lee,* the supreme court upheld the jury's verdict for David Clark on this count in a situation involving similar circumstances. As in that case, there are several particulars here that create a fact question on the issue of whether Addington's consent was voluntarily given: the threat of the IRS (a factor in *Lee*); the fact that Addington declined to consent three times, yet Elder and the officer remained on the premises (which is more indicative of coercion than in *Lee,* where there was one request to consent made at the premises); Addington's fear that he would lose his job if he did not consent (a factor in *Lee*); mention of the media, as testified to by Mrs. Addington (when she was aware that in Clark's case, media coverage had been substantial); and the fact that Addington agreed to go to his home in the first place only to allow Womack to look at the light poles (similar to the situation in *Lee*). One factor that distinguishes this case from *Lee* is that, before signing the consent, Addington took the opportunity to consult with counsel. However, while Addington's consultation with an attorney before signing the consent form is certainly a factor to be

considered in determining the voluntariness of his actions, we do not deem it conclusive. By that point, Addington had already refused to consent three times and had been subjected to the other coercive actions. The totality of the circumstances, in particular the fact that Addington declined to consent three times before succumbing, leads us to conclude that a fact question remains as to whether his consent was voluntarily given.

The only remaining question on this issue concerns the effect of a federal court ruling in Addington's previously filed 42 U.S.C. § 1983 action. The federal court ruled that, as a matter of law, Addington's consent was voluntary. Wal-Mart, in a one-paragraph argument without citation to authority, argues that the federal court's finding on this point is binding under the doctrine of collateral estoppel. Wal-Mart was likewise unable to provide supporting authority during oral argument.

 This point is barely developed enough for our consideration, but we believe it is governed by our holding in *Guidry v. Harp's Food Stores*, 66 Ark. App. 93, 987 S.W.2d 755 (1999). Guidry, who had been arrested for shoplifting, sued a police officer who worked for Harp's in federal court for a section 1983 violation and for various state law tort claims. The federal court granted summary judgment to the officer on the basis that his arrest of Guidry was reasonable and thus he was entitled to qualified immunity. The court then declined to exercise jurisdiction over the state law tort claims. When Guidry filed those claims in state court against Harp's, the federal court's ruling was set forth by Harp's as conclusive of the officer's reasonableness. The trial judge agreed, ruling that the federal court determination had "knocked out the underpinning" of Guidry's state law claims. We reversed on the basis that the type of analysis used by a court to determine the question of qualified immunity would be different from that used to determine tort liability. That reasoning does not apply here because the same analysis would be used to determine voluntariness of consent in this case as was used in the federal court case. However, *Guidry* went on to say that, where a federal court decides not to retain jurisdiction of state law claims, the plaintiff's right to litigate those claims in the future is reserved. That is the situation here. The federal court declined to exercise jurisdiction over the state law claims and thus implicitly preserved Addington's right to litigate his state tort claims to their full extent.

Finally, we address Addington's argument that summary judgment was inappropriate on his negligence claim. Addington's complaint alleged that Wal-Mart negligently failed to investigate whether Addington possessed stolen property and negligently supervised its employee, Jim Elder. The trial court ruled that there was no basis for the negligent investigation claim and that Addington failed to submit evidence that Wal-Mart knew or should have known of some prior conduct by Elder that would have put it on notice that Elder was a danger to other persons.

In his brief, Addington relies on Elder coming out to Addington's property under the guise of looking only at the light poles as evidence of a negligent investigation. While this fact may be relevant to Addington's other claims, we fail to see how it constitutes negligence. In any event, we cannot conceive how Wal-Mart could be liable for negligently determining that Addington possessed stolen property when it is undisputed that he did possess Wal-Mart property without authorization. Addington simply makes no convincing argument on this point.

■ On the negligent-supervision claim, liability for this cause of action is based upon the unique relationship between employer and employee. *Madden v. Aldrich*, 346 Ark. 405, 58 S.W.3d 342 (2001). Under this theory, employers are subject to direct liability for the negligent supervision of employees when third parties are injured as a result of the tortious acts of employees. *Id.* The employer's liability rests upon proof that the employer knew or, through the exercise of ordinary care, should have known that the employee's conduct would subject third parties to an unreasonable risk of harm. As with any other negligence claim, to prove negligent supervision, a plaintiff must show that the employer's conduct was a proximate cause of the injury and that the harm to third parties was foreseeable. *Id.* It is not necessary that the employer foresee the particular injury that occurred, only that he or she reasonably foresee an appreciable risk of harm to others. *Id.*

■ ■ The *Aldrich* case is consistent with the general line of cases on negligent supervision in that, before the supervisor is held liable, it must be put on notice that the person supervised poses a danger to third parties. *See Regions Bank & Trust v. Stone County Skilled Nursing Facility*, 345 Ark. 555, 49 S.W.3d 107 (2001); *Maneth*

*v. Tucker*, 72 Ark. App. 141, 34 S.W.3d 755 (2000); *Sparks Reg'l Med. Ctr. v. Smith*, 63 Ark. App. 131, 976 S.W.2d 396 (1998). As Wal-Mart points out in its brief, there is no evidence that it had knowledge of any propensity by Elder to be overly zealous or aggressive in an investigation. Thus, there is no evidence that Wal-Mart could have foreseen that Elder might conduct himself in such a manner. We therefore affirm on this point.

The trial court's grant of summary judgment is reversed and remanded on the intrusion invasion-of-privacy count and affirmed on all other counts.

Affirmed in part; reversed and remanded in part.

GRIFFEN and BAKER, JJ., agree.