SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-15-56

| | |
|---|---|
| MAI SAWADA<br><br>APPELLANT<br><br>V.<br><br>WALMART STORES, INC., and<br>WALMART STORES ARKANSAS,<br>LLC d/b/a WALMART<br>SUPERCENTER #58<br><br>APPELLEES | **Opinion Delivered** October 7, 2015<br><br>APPEAL FROM THE POPE COUNTY<br>CIRCUIT COURT<br>[NO. CIV 2013-104]<br><br>HONORABLE KEN D. COKER, JR.,<br>JUDGE<br><br>AFFIRMED IN PART; REVERSED<br>AND REMANDED IN PART |

## BRANDON J. HARRISON, Judge

Mai Sawada appeals a Pope County Circuit Court order granting summary judgment to Walmart on her claims for defamation, malicious prosecution, abuse of process, outrage, and false light/invasion of privacy. We affirm in part and reverse and remand in part.

## I. *Background*

Twenty-two-year-old Mai Sawada worked as a part-time cashier for Walmart in Russellville, Arkansas, in 2012. Sawada's friend Lily Xayadeth—a self-described "extreme couponer"—shopped frequently at the Russellville Walmart. After receiving a tip from an accounting associate, Walmart Asset Protection Manager Karen Bryant investigated the discounts, coupons, and price matching that Sawada had been giving Xayadeth when ringing up Xayadeth's frequent purchases. After the investigation concluded, Bryant

interviewed Sawada, and Sawada provided a handwritten statement on 6 July 2012. Here

is Sawada's entire statement:

> I have been checking this specific customer [Lily Xayadeth]. She is one of my friends so whenever she tells me the price of Ad match I do not check the ad even though it is not [a] reasonable price. She used to bring the ad since there are so much price match and coupons. I just price override whatever the price she told me. I did not know we do not ad match buy one get one free. So when she tells me buy one get one free, I used vendor coupon to take off the price. When the coupon price is more than her purchase, I put the difference on gift card, therefore she sometimes get [sic] money back from her purchase. When the price is so much cheaper than actual price, I sometimes asked her where is the Ad, and she check so many Ad[s], she cannot remember. She use one coupon per item but some coupons say when you buy two or three, you get to use the coupon. But (I would say because of peer pressure) I just scanned all the coupons she had. I put [Xayadeth's] customer discount card number and EBT even though they didn't have the card with them. Because I knew the person, and I felt sorry for them for [them] forget[ting] to bring their card.

After Bryant's investigation and interview, Sawada was arrested inside Walmart for

felony theft of property by a Russellville police officer who had spoken with Walmart

management before arresting her. The theft charge was eventually nolle prossed; Sawada

subsequently filed five tort claims against Walmart.

Her 2013 complaint claimed that the local newspaper, the *Russellville Courier*, ran

an article with her mug shot in July 2012. The newspaper article stated that Sawada

"face[d] felony theft charges after Walmart management told police she allegedly stole

approximately $8,000 over a period of time from the store's cash registers," that "store

employees 'observed [her] removing money from the registers,'" and that she had

"allegedly confessed to the theft." Sawada's complaint alleged that these statements by

Walmart to law-enforcement officers were false and should not have been used to

prosecute her criminally because she had done nothing illegal. She also said she suffered

damages by being jailed for three days and that "immediately after the [theft] allegations were published to the public, [she] was terminated from her employment at Arkansas Tech University. The pending felony theft charges were cited as the reason for her dismissal." Sawada claimed that the State nolle prossed the felony-theft charge "[u]pon learning that a store supervisor/manager had approved each and every transaction underlying the criminal accusations[.]"

Walmart moved for summary judgment in April 2014. Sawada conceded summary judgment as to her abuse-of-process claim. After considering the parties' summary-judgment papers and short oral arguments, the court entered summary judgment against Sawada on her remaining four tort claims. Sawada appeals.

## II. *Discussion*

Summary judgment is to be granted by a circuit court only when it is clear that there are no genuine issues of material fact to be litigated and the moving party is entitled to judgment as a matter of law. *Benton Cnty. v. Overland Dev. Co.*, 371 Ark. 559, 268 S.W.3d 885 (2007). Once a moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appeal, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material fact unanswered. *Id.* This court views the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review is not limited to the pleadings, as we also focus on the affidavits and other documents filed by the parties. *Id.*

SLIP OPINION

After reviewing undisputed facts, summary judgment should be denied if, under the evidence, reasonable men might reach different conclusions from those undisputed facts. *Id.*

## A. Malicious Prosecution

To establish a claim for malicious prosecution, a plaintiff must prove five elements: (1) a proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages. *Sundeen v. Kroger*, 355 Ark. 138, 142, 133 S.W.3d 393, 395 (2003). Probable cause for prosecution must be based upon the existence of facts or credible information that would induce the person of ordinary caution to believe the accused person to be guilty of the crime for which she is charged. *Wal-Mart Stores, Inc. v. Binns*, 341 Ark. 157, 163, 15 S.W.3d 320, 324 (2000). Ordinary caution is a standard of reasonableness, which presents an issue for the jury when the proof is in dispute or subject to different interpretations. *McMullen v. McHughes Law Firm*, 2015 Ark. 15, at 15–16, 454 S.W.3d 200, 210. In making a probable-cause determination in the context of a malicious-prosecution suit, the court generally "concentrates on the facts before the action commenced." *Sundeen*, 355 Ark. at 145, 133 S.W.3d at 397. But continuing a prosecution given facts that undermine probable cause can support a malicious-prosecution claim too. *Coombs v. Hot Springs Vill. Prop. Owners Ass'n*, 98 Ark. App. 226, 233, 254 S.W.3d 5, 11 (2007).

The essence of Sawada's argument on why the court erred by granting summary judgment on her malicious-prosecution claim centers on Walmart's lack of probable cause

for her arrest. More facts are needed to fully address Sawada's arguments. In its summary-judgment papers, Walmart presented evidence that it had gathered information about the drastic price reductions Sawada had applied to Xayadeth's transactions over a period of several months. For instance, in May 2012 Xayadeth bought thirty-two containers of Lysol wipes for $.75 each. The marked price for the wipes was $2.48. Sawada applied a 70% discount to the price of the wipes by adding coupons, which resulted in Xayadeth receiving $.27 from Walmart at the end of the transaction. Walmart's evidence reflects that a "supervisor override" occurred to approve the unusual transaction. According to Walmart, it suffered a loss of $55.36 on the Lysol wipes alone.

On 3 June 2012 Xayadeth made eight trips through Sawada's checkout line between 3:06 p.m. and 5:03 p.m. At 9:22 p.m., Sawada provided a price override for every single item Xayadeth bought, applied coupons, and then applied food stamps to pay for the remaining $8.50. The evidence shows no supervisor override. In her deposition testimony, Sawada admitted that her food-stamp card, not Xayadeth's, was used to pay for the transaction and that she kept the discounted food that Xayadeth had bought for her in the 9:22 p.m. transaction. According to Walmart, the loss it suffered on that transaction was $26.48.

Karen Bryant explained during her deposition that Customer Service Managers (CSMs) are supervisors who authorized many of the transactions between Sawada and Xayadeth by providing a "key flick" at checkout. The surveillance videos that were viewed during Bryant's investigation showed that the CSMs were not looking at the

discounts Sawada was making in the approved transactions; Bryant maintained that it was not her job to coach CSMs in how to do their jobs.

According to Xayadeth's deposition, a Walmart manager would come to the register and "flip their key" when she would checkout at Sawada's register. Xayadeth stated in her deposition that half the time she did not show Sawada an ad for the items she bought by extreme couponing and that she gave Sawada some of the razors, deodorant, and detergent that she had purchased. Xayadeth agreed that it could look suspicious to Walmart when she received discounts without showing ads to Sawada.

Attached to Sawada's summary-judgment papers was a police report arising from her arrest. The summary page of the report states:

> On Friday the 6th of July 2012 at 9:41pm I, Sgt. Alan D. Bradley while I was making a walk through Wal-mart was contacted by Joshua Macisaac, a loss prevention officer, who asked me to wait there because they had an employee theft. Just a few minutes later I was escorted to the security office where I met with Mrs. Karen Bryant, a supervisor and Ms. Mai Sawada, the suspect. Mrs. Bryant informed me that they had observed Ms. Sawada taking money out of the registers. Ms. Sawada had written a statement along with Mrs. Bryant and another employee. The total loss to Walmart was $8,000[.]

After the *Russellville Courier* published the story of Sawada's arrest, Bryant said she called the "media person for the city police" and told him that the newspaper article was incorrect because Sawada did not steal money out of the register. Sawada was charged with theft of property greater than $1,000, but less than $5,000—a class D felony. Ark. Code Ann. § 5-36-103 (Repl. 2013). The criminal information alleged that Sawada "[k]nowingly, willfully, and unlawfully [took] or exercise[d] unauthorize[d] control over

property belonging to Walmart ($8,000) with the purpose of depriving the rightful owner[.]" As we said earlier, the State eventually abandoned its prosecution.

Sawada first argues that no probable cause existed for her arrest because Walmart CSMs consistently authorized the transactions—nearly 50% of the time by our rough count from what we have gleaned from the record. While an important fact, we do not think it solely determines whether sufficient facts as a whole supported a reasonable belief that Sawada had committed the charged crime. If Walmart "believed and had grounds for entertaining 'honest and strong suspicion' that [she] was guilty" of theft, and that belief is reasonable, then Sawada's claim must fail if she offers no proof to the contrary. *See Binns*, 341 Ark. at 163, 15 S.W.3d at 324; *see also Carmical v. McAfee*, 68 Ark. App. 313, 322, 7 S.W.3d 350, 356 (1999).

Walmart made a detailed investigation before reporting anything to the authorities; it produced video surveillance of the transactions, an electronic log of the cash-register transactions, and Bryant's handwritten notes that resulted from her investigation—a combined three hundred pages. Bryant swore that she turned over all the surveillance videos used in her investigation to the prosecuting attorney's office. Sawada does not contest the factual findings of the investigation, including the dollar amount of the price discounts. Sawada admitted that the prices she gave Xayadeth were unreasonable and that she did not check the competitor-ad prices or Walmart's policy on buy-one-get-one-free ads. It was undisputed that Sawada essentially "believed" and took Xayadeth's word for what the price of an item should be. No evidence of Sawada giving customers other than Xayadeth specially reduced prices was presented, either. That the managers may not have

been appropriately supervising Sawada does not preclude summary judgment when the record as a whole is considered. Management involvement is relevant to our analysis, but it does not scrub Sawada's conduct clean. Simply put, the information that Walmart possessed from its internal investigation and subsequent interview of Sawada was enough to cause a person of ordinary caution to believe, from a probable-cause standpoint, that Sawada committed a theft. *See Cordes v. Outdoor Living Ctr., Inc.*, 301 Ark. 26, 31–32, 781 S.W.2d 31, 33 (1989).

Sawada further argues that Walmart unreasonably omitted the CSM approvals when it reported to the police, or so a jury could find. She also says that Bryant's reported statement to Officer Bradley that she observed Sawada "taking money out of the registers" raises a genuine issue of material fact on whether Walmart's prosecution was based on an "honest and strong suspicion." Walmart responds that "[t]he facts supporting Bryant's 'honest and strong suspicion' related to Sawada are clear and undisputed"; "Sawada admits to her wrongdoing"; and because "[t]he fact that the officer somehow understood the theft was of cash—rather than a result of Sawada and her friend taking over $8,000 via inappropriate price discounts—is of no consequence to the probable cause determination at issue here."

We agree with Walmart that Sawada's arguments are not enough to defeat summary judgment given this unique case. We view the evidence in the light most favorable to Sawada, and resolve all doubts and inferences against Walmart. Even so, Bryant's alleged failure to disclose manager approval is not evidence of Walmart's lack of probable cause—or "sinister motive," as Sawada calls it—because it is undisputed that

Walmart's entire file was turned over to prosecutors and because the management-approval information was contained in the file. Sawada offers no proof to the contrary. *See Templeton v. United Parcel Serv., Inc.*, 364 Ark. 90, 216 S.W.3d 563 (2005) (nonmoving party must meet proof with proof).

On a related point, Officer Bradley's report that "Mrs. Bryant informed me that they had observed Ms. Sawada taking money out the registers" also does not raise genuine issues of material fact on Walmart's lack of probable cause because Bryant had a "honest and strong suspicion" that Sawada had committed a theft. Bryant's contemporaneous handwritten "Statement of Events," which is attached to Officer Bradley's report, mentions Sawada giving price discounts and "using more coupons on the transaction than what the customer had" but does not state anything about money being taken out of the cash register. Bryant swore in her first affidavit, "At some point, I learned that the Prosecuting Attorney dismissed the charges against Sawada. I disagree with the decision to dismiss the charges, and I believe my investigative file and Sawada's admission to the wrongdoing are more than sufficient to convict Sawada for her wrongdoing." A reading of supreme court precedent, most notably *Binns*, seems to indicate that probable cause exists when a person honestly but mistakenly believes someone is guilty of a crime and that mistaken belief is reasonable. *See also Wal-Mart Stores, Inc. v. Williams*, 71 Ark. App. 211, 214, 29 S.W.3d 754, 756 (2000) ("The test for determining probable cause is an objective one."). That is the case here. Whether Officer Bradley was "misled" about what happened (Sawada's view) or "misunderstood" what Bryant reported to him (Walmart's view) is, for probable-cause purposes, immaterial to the question of what



Bryant herself understood. It is, however, material to Sawada's defamation claim—more on that below.

The bottom line for the malicious-prosecution claim is this: Walmart is entitled to a summary judgment on the claim because Bryant had an honest and strong suspicion, based on a thorough investigation, that Sawada had committed theft.

## B. Defamation

To recover for defamation a plaintiff must prove six elements: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) the damages suffered by the plaintiff. *See Superior Fed. Bank v. Mackey*, 84 Ark. App. 1, 129 S.W.3d 324 (2003). Sawada's claim for defamation turns on the statement that appeared on the summary page of Officer Bradley's report: "Mrs. Bryant informed me that they had observed Ms. Sawada taking money out the registers." Walmart argued to the circuit court that, even if Sawada can establish that the statements about her taking money from the cash register were defamatory, her claim should be dismissed because the statements are also privileged. The circuit court, in turn, found that Walmart established a "prima facie entitlement to a qualified privilege on their communications with law enforcement and [Sawada] failed to meet [Walmart's] proof with proof demonstrating that this privilege was abused or should be defeated." For purposes of deciding whether the circuit court correctly granted summary judgment based on qualified privilege, we will assume the statements appearing in the police report and

the newspaper meet the six elements listed above, but we will discuss whether the court correctly determined that the statements were privileged as a matter of law.

The law recognizes that a potentially defamatory communication may not impose liability under the qualified-privilege doctrine. A statement may become privileged when made in good faith and in reference to a subject matter in which the communicator has an interest or duty and to a person having a corresponding interest or duty. *See Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002). For example, negligently reporting activity thought to be criminal is usually a privileged communication. *See DeHart v. Wal-Mart Stores, Inc.*, 328 Ark. 579, 946 S.W.2d 647 (1997). But even if a statement may possibly be privileged, the speaker who steps outside the privilege, or abuses it, loses it. *Navorro-Monzo v. Hughes*, 297 Ark. 444, 763 S.W.2d 635 (1989). The qualified-privilege doctrine does not extend to published statements that have no relation to the protected interest; and it is lost if the publication is not made for the purpose of furthering a common interest. *Id.* The qualified privilege may also be lost by the publisher of a defamatory statement if it is abused by excessive publication, if the statement is made with malice, or if the statement is made with a lack of grounds for belief in the truth of the statement. *Superior Fed. Bank*, *supra*; *Addington v. Wal-Mart Stores, Inc.*, 81 Ark. App. 441, 105 S.W.3d 369 (2003).

Bryant interviewed Sawada late on the night of 6 July 2012. After the interview ended and Sawada had drafted her handwritten statement, Bryant located Sergeant Alan Bradley, who was in the store at the time, and took him to the area where she and Sawada were located. In her first affidavit Bryant stated that she explained to Officer Bradley that,

after she reviewed videos and other evidence, she discovered that Sawada had been providing a friend with drastic and inappropriate price discounts. According to Bryant, she told Officer Bradley that the loss to Walmart as a result of Sawada's actions "was in excess of $8,000[.]" The officer immediately arrested Sawada for theft, handcuffed her, and escorted her through the store and on to jail, where Sawada remained for three days. As we said earlier, Officer Bradley's arrest-report summary states, "Mrs. Bryant informed me that they had observed Mrs. Sawada taking money out of the registers."

Also attached to the police report is Bryant's handwritten "Statement of Events" dated 6 July 2012. That statement chronicles her investigation—it does not mention Sawada "taking money out of the registers." During her deposition, Sawada said that she did not know Karen Bryant before Bryant interviewed her on July 6 and that her employment with Walmart was terminated when the interview ended. Sawada also said that she never heard Bryant, or the other two people in the room, talk with the police officer; nor did she know what the police officer was told until she went to jail. When she got to jail, according to Sawada, the police officer told her that she was arrested for stealing $8,000 from the cash register. Sawada said in her deposition that Bryant never talked to her about stealing money from the registers, and that she thought Bryant "told a lie to the police" about it. Otherwise, according to Sawada, she had "no idea" how the police officer came to believe that she had stolen cash. In contrast, Bryant said that she called the "media person for the city police" and told him that the newspaper article was incorrect because Sawada did not steal money out of the register. The officer allegedly

told Bryant he would get the statement corrected. (The actual newspaper publication is not in the record but the parties do not dispute its essential content.)

We hold that genuine issues of material fact surround what Bryant may (or may not) have told Sergeant Bradley. Employers have a duty to accurately report the circumstances of an employee's termination. *See Dillard Dep't. Store, Inc. v. Felton*, 276 Ark. 304, 634 S.W.2d 135 (1982) (addressing defamation suit and qualified privilege). This record presents a triable dispute on whether Walmart accurately reported the circumstances of Sawada's termination to the police. Was she fired for stealing $8,000 from the cash register? Or was she fired because she gave a friend $8,000 worth of drastic and unreasonable price discounts in a manner that Walmart deemed unethical? Walmart maintains these two allegations are not materially different for summary-judgment purposes. We disagree. Walmart argues that Bryant's quick call to the police's media officer to report the story as inaccurate means that a reasonable person must conclude that the police officer misunderstood her. But recall that the qualified privilege available to a defendant may be defeated "if the statement is made with a lack of grounds for belief in its truthfulness." *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 735, 74 S.W.3d 634, 654 (2002). Sawada accused Bryant of misleading, or possibly even lying, to law enforcement. An admittedly inaccurate version of events was published in a Russellville newspaper based on Officer Bradley's report, a report that was in turn based on what Bryant had reported to him. This link presents a fact question on whether Walmart exceeded the qualified privilege of reporting criminal activity to law enforcement. We therefore reverse the


summary judgment and remand for further proceedings on the defamation claim and the related qualified-privilege defense.

## C. False Light

A false-light/invasion-of-privacy claim has two essential elements: the complaining party must show (1) that the false light in which he was placed by the publicity would be highly offensive to a reasonable person, and (2) that the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed. *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979). The evidence must support the conclusion that the publisher had serious doubts about the truth of his publication. *Addington v. Wal-Mart Stores, Inc.*, 81 Ark. App. 441, 452, 105 S.W.3d 369, 377 (2003). In false-light actions, the plaintiff must meet her burden of proof by clear-and-convincing evidence. *Id.*

Sawada does not explain how her privacy interests were invaded to such a degree that the law should recognize a legal wrong. We hold that Sawada has not clearly expressed or developed an argument supporting reversal of her false-light claim. *See Alexander v. McEwen*, 367 Ark. 241, 239 S.W.3d 519 (2006) (noting that this court does not develop issues for appellate parties at the appellate level); *see also Williams v. Brushy Island Pub. Water Auth.*, 368 Ark. 219, 243 S.W.3d 903 (2006) (holding that this court refuses to consider arguments not supported by convincing argument or citation to legal authority). We therefore affirm on this point.

SLIP OPINION

### D. Outrage

The tort of outrage—also known as intentional infliction of emotional distress—opens an actor up to civil liability for committing extreme and outrageous behavior. *See McQuay v. Guntharp*, 331 Ark. 466, 470, 963 S.W.2d 583, 585 (1998). This disfavored claim has four elements:

(1)  the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct;

(2)  the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community";

(3)  the actions of the defendant were the cause of the plaintiff's distress; and

(4)  the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 957, 69 S.W.3d 393, 403–04 (2002).

Sawada argues that a genuine issue of material fact exists on whether Walmart's conduct was extreme and outrageous. Among other things, she argues that Walmart misinformed the arresting officer about her alleged conduct, withheld exculpatory evidence, allowed her to be publicly escorted from the store in handcuffs, never told her that she was performing her job incorrectly before her arrest, and "allowed supervisors to influence, pressure, and verbally strong-arm [her] into writing statements she discussed during the interrogation."

Having viewed the facts in the light most favorable to Sawada, we hold that the circuit court correctly dismissed the outrage claim. An allegation of theft in the employment context does not generally equate to outrageous conduct. *See Unicare Homes,*

*Inc. v. Gribble*, 63 Ark. App. 241, 977 S.W.2d 490 (1998). Further, our research has revealed only one precedent of outrage by an employer against an employee. And that case's facts do not closely mirror this one. *See Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984) (employer cursed employee, threatened him, slammed a drawer, and refused to allow employee to take his prescribed medication, which resulted in the employee being hospitalized for a week). Based on our plenary review of the whole record, Sawada has presented no material-fact dispute on whether her emotional distress was so severe that no reasonable person could be expected to endure it or that Walmart's actions were outrageous under Arkansas law. So the court's dismissal of Sawada's outrage claim is affirmed.

### III. *Conclusion*

We affirm the circuit court's dismissal of Sawada's claims for malicious prosecution, abuse of process, false light/invasion of privacy, and outrage. We reverse the summary judgment against her defamation claim and remand for further proceedings.

Affirmed in part; reversed and remanded in part.

KINARD and GLOVER, JJ., agree.

*Odom Law Firm, P.A.*, by: *Conrad T. Odom* and *Skelton Law Firm, P.A.*, by: *Wm. Douglas Skelton*, for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Jeffrey L. Spillyards*, for appellees.