

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-16-810

| | |
|---|---|
| | **Opinion Delivered** September 20, 2017 |
| LARRY PINGATORE | |
| APPELLANT | APPEAL FROM THE CRITTENDEN COUNTY CIRCUIT COURT [NO. 18CV-11-466] |
| V. | |
| | HONORABLE PAMELA HONEYCUTT, JUDGE |
| UNION PACIFIC RAILROAD COMPANY and DENNIS HATLEY | |
| APPELLEES | |
| | AFFIRMED |

## BRANDON J. HARRISON, Judge

This summary-judgment case involves an employee's privacy rights in the employment drug-testing context. Larry Pingatore has been employed by Union Pacific Railroad (UP) since at least 2002. He worked as a signalman in California for UP. He took a two-month leave of absence in 2002 and a six-month leave in 2005. In 2005 Pingatore went through inpatient substance-abuse treatment for alcoholism. After that absence, the company began drug testing him more frequently.

A third leave of absence was taken in 2007, for four months, when Pingatore on his own initiative participated in an employee-assistance program for alcoholism. An element of the program was a three-year follow-up plan, which required that Pingatore be tested six times during the first year, nine times the second year, and six times the third year. Pingatore did not sign any consent forms related to the testing. But under UP's voluntary-referral

policy, if Pingatore did not follow the "rehabilitation instructions," then he would have been placed in a medically disqualified status. UP's drug-and-alcohol policy treats an employee's voluntary "referral and subsequent handling, including counseling and treatment, as confidential, subject to the exceptions set forth in the EAP policy and procedures." Drug testing resumed after Pingatore returned to work; he took approximately five tests in seven months.

Pingatore was injured on the job in April 2008 and was granted another leave until November 2009. When he returned to work UP relocated him from California to West Memphis, Arkansas, where he became a security guard because he could no longer work as a signalman. His duties at the West Memphis facility included counting trucks entering and leaving the facility in a one-person guard shack. Some testimony stated that as many as 1400 truck drivers go in and out of the facility each day.

After his arrival in West Memphis, UP drug tested Pingatore more frequently. He was required to take eighteen tests in eleven months (from November 2009 to October 2010), which was more than the company's assistance plan called for. UP maintained that the frequency was caused by "the computer" trying to catch Pingatore up on the tests he had missed while he was out for his work-related injury.

Most of the Arkansas-based urine tests were administered by a third-party contractor at Pingatore's work site. The contractor was Alcohol Drug Testing Services; the certified tester's name was Dennis Hatley. Pingatore claimed that it was apparent to anyone who was present that he was undergoing a drug test and that it was not uncommon for truck drivers to request to use the bathroom while a test was being administered. According to

Pingatore, some truck drivers started referring to him as "pothead" because of the frequency and number of tests that were administered. On one occasion a coworker would rev his engine up when Pingatore would walk by and would say, "You're a little jumpy, aren't you?" He maintained that the testing was not done discretely because truck drivers and others would come into the shack while tests were being administered, Hatley would wear a white lab coat when he performed the tests, Hatley's vehicle was distinctive, and Hatley (and Pingatore's supervisor) told people that a drug test was underway. Pingatore felt that the tests were administered in a public place as a part of an effort to get rid of him because he had complained. UP maintained that Pingatore provided urine samples privately in the restroom, that the collector did not generally observe the test, that managers have discretion in the setting and time of day to test, and that Pingatore did not object to them. The last test was administered in October 2010. Pingatore never tested positive and fully cooperated with the railroad's employee-assistance program.

Pingatore sued Union Pacific and Hatley (individually) in August 2011, alleging that they had invaded his privacy and defamed him. Summary judgment was granted on the defamation claims in November 2013. The remaining claims were dismissed with prejudice in a second summary-judgment order entered in April 2016. Pingatore appeals the dismissals.

## I.

Summary judgment may be granted by a circuit court when there are no genuine issues of material fact to be litigated and the moving party is entitled to judgment as a matter of law. *Patrick v. Tyson Foods, Inc.*, 2016 Ark. App. 221, at 3, 489 S.W.3d 683, 688 (internal

SLIP OPINION

citations omitted). Once a moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. On appeal, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material fact unanswered. *Id.* This court views the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. After reviewing undisputed facts, summary judgment should be denied if, under the evidence, reasonable people might reach different conclusions from those undisputed facts. *Id.*

In his complaint, Pingatore made three common-law claims against UP and Hatley:

A. Intrusion

B. False Light

C. Defamation

Pingatore abandoned an additional claim under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq.

### A. Intrusion

In *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979), our supreme court adopted the approach of the Restatement (Second) of Torts, which delineates four separate torts grouped under "invasion of privacy." *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 719, 74 S.W.3d 634, 644 (2002). The Restatement provides that one who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another's private affairs or concerns, may be held liable to the other for invading his or her privacy.

*McMullen v. McHughes Law Firm*, 2015 Ark. 15, at 14, 454 S.W.3d 200, 209. The alleged intrusion must be highly offensive to a reasonable person. *Id.* This privacy tort covers behavior harmful to the plaintiff although there is no reputational injury. Intrusion has been recognized in Arkansas as one of the four actionable forms of invasion of privacy. An intrusion occurs when an actor believes, or is substantially certain, that he or she lacks the necessary legal, or personal permission, to commit the allegedly intrusive act. *Id.*

We start with Pingatore's intrusion-upon-seclusion claim against UP. The question presented here as we understand it is whether UP's drug-testing conduct, when considered in context, equates to an intrusion that a reasonable person might find highly objectionable. Pingatore essentially argues that UP's testing was offensive to him, and would be to any reasonable person, because (1) he was subjected to far more tests than any of his colleagues, (2) the testing was done at a location with a substantial amount of foot traffic, (3) it was obvious he was being tested, and (4) his coworkers and supervisor thought he had an active substance-abuse problem or had tested positive. UP, in turn, argues that it

> has not alleged it has a free pass to do anything it desires in the drug-testing context or that nothing in the context of drug testing could ever be an invasion of privacy . . . [but its testing of Pingatore], based on undisputed material facts, was not intrusive as a matter of law as it was not an intrusive act that would be offensive to a reasonable person.

Though we are deciding state common-law claims in this case, the Supreme Court of the United States informs our decision because the railroad industry is directly involved. In *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989), the Supreme Court primarily addressed whether the Fourth Amendment to the U.S. Constitution applies to the drug-and-alcohol testing mandated, or authorized, by regulations promulgated by federal

agencies. Testing constitutes a search even if carried out by private parties, where the persons carrying out the testing act as an instrument or agent of the government. There the Court recognized a privacy interest in the process of monitoring the urine sample and collecting it. *Id.* at 617. And it did so because "[t]here are few activities in our society more personal or private than the passing of urine." *Id.* (internal citations omitted). Pingatore's complaint is not solely about the act of passing urine, because he is concerned primarily about how he appears to others given the frequency of the testing and the manner in which it was carried out. Yet the Court in *Skinner* recognized that an employer has a legitimate counterpoint to a privacy concern, which is a safe workplace. *Id.* at 634 (mandatory urinalysis of workers in certain circumstances is not unreasonable). Railroad employees participate in a highly regulated industry, have a "diminished expectation of privacy," and ordinarily consent to employer-imposed restrictions on their freedom of movement. *Id.* at 633–34. Closer to home, and as a general matter, Arkansas has a "Drug Free Workplace" law that discourages drug or alcohol abuse by employees and provides employers special consideration in the setting of workers'-compensation insurance rates. *See* Ark. Code Ann. §§ 11-14-101 & -112 (Repl. 2012). So testing can and will be done by employers. The main question, however, is whether a triable issue of fact exists on whether UP's testing in this case rose to the level of being highly offensive to a reasonable person.

We hold that there is no triable fact on this record. In his deposition, Pingatore said that that he was embarrassed by the drug-and-alcohol testing and he felt that his character had been smeared. He said that the testing in California was discrete, but the Arkansas testing was not and that people would come into the guard shack while the tests were being

administered. Several times truck drivers would impair the tests by using the bathroom while the breathalyzer test was being administered, according to Pingatore. He also said that he has been prescribed medication due to the stress and anxiety the testing caused. Pingatore said that UP conducted one "observed test" in 2011 after the lawsuit had been filed, during which the tester stood behind Pingatore as he made the sample. The other tests conducted were not of the observed variety.

Recall that, as part of Pingatore's follow-up testing plan, he was supposed to be tested six times in year one, nine times in year two, and six in year three. UP tested Pingatore eighteen times in less than one year. Charles Gessford, the manager of UP's employee assistance program, testified in his deposition that this was a "moderate" program and that if Pingatore had a positive test, he would have doubled the number of tests and lengthened the follow-up time to five years, instead of three years. Penny Lyons, a senior manager of drug-and-alcohol testing for UP, said during her deposition that she had seen as many as twenty-four to thirty-six follow-up tests given in one year. The inference here is that what Pingatore experienced is not novel. As we mentioned earlier, it is undisputed Pingatore never tested positive. There was a discrepancy in the testimony regarding the environment in which the tests were done. Pingatore's work area contained a guard shack, with a single bathroom (according to Pinagatore). But Dennis Hatley, the tester, referred to "toilets."

In his deposition, Gessford (the manager of the UP employee-assistance program) agreed that there was an expectation of confidentiality and discretion to follow-up testing of a self-referred employee like Pingatore. UP's April 2012 "Drug and Alcohol Refresher for Managers" states that a test "should never be 'announced' in front of others. This is

more than a courtesy; it is a requirement for confidentiality." Pingatore's supervisor, Bazile, said that he never had an employee who was tested as frequently as Pingatore. He would assume Pingatore's duties while Pingatore was being tested. Bazile also said that he did not try to minimize the knowledge of others that a drug test was going on, that it was "pretty much common knowledge" that Hatley was there to administer a drug or alcohol test, and that Bazile would tell truck drivers not to use the bathroom because a test was going on. And Bazile agreed that he could understand why someone might suspect that an employee who was tested as frequently as Pingatore had a drug or alcohol problem. Another employee who was tested as often as Pingtore was rumored to have quit because of an ongoing drug or alcohol problem.

Inspector Hatley produced the affidavit of Ross B. Ose, who concluded that Hatley had followed the DOT regulations related to the testing. Hatley said that he was not given any instructions by UP on how Pingatore's testing was to be done. When asked in his deposition if Hatley had done anything that offended or embarrassed him, Pingatore replied, "No." He also said that Hatley would tell the truck drivers that "we're administering a test now." And on two occasions when a truck driver knocked on the door Pingatore said, "I'm busy right now; I'm doing a test."

Pingatore, in turn, produced an affidavit from Ronald E. Henson, Ph.D., stating that Hatley and UP had not followed the proper procedures, different procedures could allow the testing to be done more discretely, and the procedures the company used suggested that Pingatore had an active drug or alcohol problem.

Pingatore argues that a jury should get to decide his intrusion claim because, "[i]n a civil case, the issue of whether consent was valid is a question of fact that must be decided by the trier of fact." Pingatore's brief relies heavily on *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002). The *Lee* case is wholly distinguishable because of the protected privacy interest at stake. In *Lee*, Walmart suspected an employee of stealing and searched the employee's house without notice. A person has a protected privacy interest in his or her own home outside of work. But that is a material difference from the privacy interest argued for in this case. Here, Pingatore had a *limited* privacy interest because he was an employee with a history of drug-and-alcohol abuse and worked in a safety-sensitive position. And the manner and circumstances in which the tests were actually administered did not rise to the level of presenting a triable issue of fact on whether UP may be held liable to Pingatore for intruding on a recognized privacy interest.

Viewing the facts in the light most favorable to Pingatore, we hold that there was no unlawful invasion of his privacy and that UP was entitled to judgment as a matter of law on these facts. Pingatore performed the tests for years without complaining or otherwise protesting—apart from asking, one time when in Arkansas, why the testing was being done so often. He filed no complaint until the testing period had ended. He requested no accommodations nor did he behave in any way that would have put UP on notice that it lacked his consent to the tests. His leave due to a job-related injury factored into the frequency of the testing. And his rather isolated job location affected the manner in which the tests could be given. That he could be placed on a medically disabled status does not

make a material issue of fact as to his consent considering all the circumstances and highly regulated area of the law. *See generally* 49 U.S.C. § 20103; *see also* 49 C.F.R. § 219.

Pingatore had a privacy interest as an employee with a history of substance misuse. The privacy interest he has does not, however, extend to cover the fact that he was being drug tested; nor was he entitled to complete anonymity as he was being tested. He was not an anonymous urine donor. Moreover, the particular manner and circumstances under which the tests were conducted in this case do not rise to an unlawful invasion of Pingatore's privacy. The circuit court's summary judgment against Pingatore's intrusion claim is affirmed.

We also hold that Dennis Hatley was entitled to summary judgment against Pingatore's intrusion claim. That claim fails because Pingatore did not establish that Hatley's actions could be highly offensive to a reasonable person. Pingatore himself stated that Hatley did not do anything that he (Pingatore) thought was inappropriate.

## B. False-Light Claims

A false-light/invasion-of-privacy claim has two essential elements: the complaining party must show (1) that the false light in which he was placed by the publicity would be highly offensive to a reasonable person, and (2) that the defendant knew, or acted in reckless disregard of, the falsity of the publicized matter and the false light in which the plaintiff would be placed. *Sawada v. Walmart Stores, Inc.*, 2015 Ark. App. 549, at 14, 473 S.W.3d 60, 68–69 (internal citations omitted). The evidence must support the conclusion that the publisher had serious doubts about the truth of his publication.

Pingatore contends that the false light UP's testing placed him in was the "suggestion that he had an active problem (as opposed to a problem in the past)." As we mentioned earlier, given the highly-regulated nature of Pingatore's field of employment, he did not have an absolute (or unqualified) right to keep private the fact that he was being drug-and-alcohol tested. And here again, the particular manner and circumstances under which the tests were conducted in this case do not rise to the level of creating a triable issue on whether UP painted Pingatore in a false light. Viewing the facts most favorable to Pingatore, truck drivers referred to him as "pothead" and asked about why he was so "jumpy." And supervisor Bazile said that he could understand why someone would have a suspicion that an employee who was tested as frequently as Pingatore had a drug or alcohol problem. Another employee who was tested as often as Pingtore was rumored to have quit because of an ongoing drug or alcohol problem. He also said that he would not trust someone with a drug or alcohol problem as much as someone who he believed did not have the problem. Bazile also said that Pingatore was being tested frequently because of something that had happened in the past, a past whose truth no one disputed or misrepresented on this record. Based on his own deposition testimony, Pingatore said on one occasion, "I'm busy right now; I'm doing a test."

The bottom line is that Pingatore failed to demonstrate a genuine issue of material fact that UP or Hatley published private information about him—much less information that was inaccurate to a misleading degree or flat-out untrue. Importantly, neither UP nor Hatley disclosed the confidential results of any test. Pingatore did not allege that UP or Hatley published protected information to others apart from a revelation that a test was

occurring. As we stated earlier, there is no requirement that the testing frequency, manner, or location be shrouded in secrecy. Given this record, we affirm the circuit court's summary judgment on Pingatore's false-light claims against UP and Hatley.

### C. Defamation Claims

To recover for defamation, Pingatore must create a triable issue on six elements: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to him; (3) publication of the statement by UP or Hatley; (4) UP or Hatley's fault in the publication; (5) the statement's falsity; and (6) that Pingatore was damaged. *See Patrick v. Tyson Foods, Inc.*, 2016 Ark. App. 221, at 15–16, 489 S.W.3d 683, 694–95. A viable action for defamation turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation. A plaintiff must prove that defamatory statements have been communicated to others and that the statements have detrimentally affected those relations. *Id.*

Defamation requires a false statement. Pingatore has not identified any false statement that either UP or Hatley made. He instead argues that their conduct impermissibly suggested that he was a drug user or an alcohol abuser. While gestures, or even the exhibition of a picture, may qualify as a "statement" within the meaning of defamation law, *Navorro-Monzo v. Hughes*, 297 Ark. 444, 448, 763 S.W.2d 635, 637 (1989), conducting drug tests in a highly-regulated safety industry is not an actionable "statement." The circuit court found that Pingatore "failed to show any actionable defamatory statement or overt defamatory act." We agree that Pingatore's defamation claims fail as a matter of law.

Affirmed.

GRUBER, C.J., and ABRAMSON, J., agree.

*Easley & Houseal, PLLC*, by: *B. Michael Easly*, for appellant.

*Friday, Eldredge & Clark, LLP*, by: *H. Wayne Young, Jr.*, for appellee Union Pacific Railroad Company.

*Williams & Anderson, PLC*, by: *Heather G. Zachary* and *David M. Powell*, for appellee Denis Hatley.